All right, so who's starting? I think in our email correspondence we said the employer would start, then followed by the union. I didn't get copies of that correspondence, just tell me. Yeah, of course, of course. John Merrill on behalf of UPS Supply Chain Solutions, Inc., the respondent cross-petitioner. Okay, and you're taking 10 minutes. Correct, Your Honor. Okay. All right, may it please the court. As stated, I'm John Merrill on behalf of UPS Supply Chain Solutions, Inc. This case involves a union election at my client's facility in Tracy, California. It involves what the NLRB has for decades referred to as laboratory conditions. The concept comes from a 1948 case that says, in election proceedings, it is the board's function to provide a laboratory in which an experiment may be conducted under conditions as nearly ideal as possible to determine the uninhibited desires of employees. This court has described the policy consideration at play in the laboratory conditions concept is as allowing voters quiet moments of appropriate reflection and a peaceful atmosphere for the casting of their votes, and that's from the Robert Tors case cited in our briefing from 1978. So there have been many decades of case law to establish the contours of laboratory conditions, and some of those cases involve some arguably arbitrary standards or amorphous standards to determine whether conduct interferes with laboratory conditions. There is one line of cases that establishes what I think is, on the other hand, a very easy standard to apply, which is that party representatives, whether union or the employer, should not be present in an area where voters need to pass in order to vote. The Pearson education case from 2001 is addressed in our brief, established that standard. It's also supported by older cases. The performance measurements case from 1964 that says the continued presence of the employer's president at a location where employees were required to pass in order to enter the polling place was improper conduct, not justified by the fact that the president was instructing supervisors on the release of employees for voting purposes. In other words, the presence of a party representative in an area that voters have to pass to vote is objectionable. Robert Tors acknowledged that the physical proximity of campaigners — to this election. So why did they err? Why don't you just get right to the heart of this case? You raised four objections. Most of them pertain to what happened in the parking lot outside of the building. The election area was inside the building in a break room, if I'm not mistaken. You had to pass through some doors and areas to get to the break room. There was an area outside the facility. There's the gate. An area outside the facility. Then you entered the building, and then the break room was somewhere within the building. And all the things you're complaining about occurred in the parking lot outside of the facility. That's correct. Okay. So you had four objections about what happened. So why don't you tell us? The main objection and the main thrust of those is that behavior, even in the parking lot, if it occurs in an area that voters have to pass in order to vote, can be objectionable. This Court's acknowledged that campaigning 150 feet away can be objectionable in the Roberts-Tors case. In the Nathan Katz Realty case, you had union representatives just sitting in their car, not even talking to people, but honking. That's a D.C. Circuit case, and their continued presence was objectionable. In the Alliance Ware case... This case.  What happened? Correct. Correct. And all I'm trying to say is that behavior in the parking lot can be objectionable. Right. Right. Of course, but none of the things you just said in those three cases happened here. There weren't cars with horns. So why is what happened here? And was there even electioneering in the parking lot? There were prolonged discussions with the voters in the parking lot, with several voters. There were voters who, you know, trying to get in the parking lot, had to swerve to get around these union officials who, again, were present in the parking lot in an area that voters had to pass in order to vote. And the distinction of there being a physical barrier is certainly one that is discussed in many of these Board cases. As I said, there are also cases where campaign messages could not be heard inside the facility, but could be heard. Okay. So, you know, I think we can all agree with the legal, abstract legal principles you're talking about. But here, for example, on the conversations, the Board found that there were only three conversations. One each for grayism and omidor. And you're arguing that's electioneering? What was wrong with those conversations? They were prolonged conversations. In one instance, Gray did testify that the vote was discussed. She denies that there was actual urging to vote one way or another. You know, omidor says that he was just greeting the union, but that conversation lasted two minutes. You know, even regardless of electioneering, what these other cases that I mentioned stand for is the proposition that the mere presence of a party can interfere with those quiet moments of appropriate reflection. So your argument is then on that point is that the union representatives who were out in the parking lot in the gathered space, some of them weren't all together at all the time, but at various points there were some near a fire hydrant, others near a table, others just standing around by cars. So your point is just the presence in that parking lot was intimidating. Correct, correct. To the eligible voters who were going to go in at the second shift, before the second shift, go in and maybe vote. That's right. That's correct. And, you know, management acknowledged they sequestered themselves. They didn't want to be in front of the voters, but the union was present. They called out to some voters. They called out to some employees. The hearing officer, in a very complete decision it looked like to me, it was some 16 pages, went through all the objections, went through all the evidence. There was conflicting testimony, and she made findings, basically rejecting many of the arguments you make about what took place out in the parking lot. Why, I mean, she heard the witnesses judge credibility and made specific findings. Substantial evidence sort of looks like it supports what she did. What do we do with that? I simply believe that the way the hearing officer applied the law disregarded these authorities. You don't object to her factual findings then? Well, there may be one or two very small things in the brief that we object to from a factual standpoint. Did you just say she got the law wrong? By and large, yes. Okay. Correct. That helps. Do we give deference to the board's reading of the law? I mean, put it another way, does Looper-Bright affect it at all? I didn't see it raised in the brief. Did not raise it in the brief. I mean, part of that may be a function of timing, and I can't recall whether Looper-Bright was out when the briefs were prepared, but certainly it could have a bearing on the level of deference to which the board would be entitled. I could see that. The other policy consideration I would mention is the concept discussed in Phillips-Chrysler, which, again, involved very different behavior, but the idea that the message conveyed to employees by union agents trespassing on company property is that the employer is powerless to protect its own legal rights in a confrontation with the union. And, you know, we would also argue that that policy consideration is best served by a ruling that's consistent with Pearson Education and other authorities' side in our brief, that neither union reps nor company reps should be present in an area that voters have to pass in order to vote, whether it's the parking lot or behind closed doors. There was a board rep present during the election. Did the board rep before – it looks like there's a pre-meeting before the election gets underway, and the board rep sort of lays down some rules that the employer is supposed to abide by and union reps are supposed to abide by. Did he say anything at all about the parking lot? Nothing about the parking lot. The board agent made sort of a vague statement along the lines of, you can't be in here, which is the polling area. The building. Right, right. You walk into the building, you go through security, you go into the polling area, basically. And the regional director's decision sort of vaguely suggested that that might be the establishment of a no-election hearing zone by saying that there was no evidence that the board agent established a no-election hearing zone other than the polling area or something like that. But I think the board and the employer and even the union, I think, take the position that that was not the establishment of a no-election hearing zone, that vague comment that you can't be in here. Okay. All right. Any further questions? No. Thank you for your time. Okay. Thank you. All right. So I guess Mr. Earle is going next. Good morning, Your Honors, and may it please the Court, this is Matthew Earle for Air National Brotherhood of Teamsters, Local 439. I'd like to reserve four minutes for rebuttal, please. The union fully joins in the NLRB arguments with respect to the objections here, which we believe do not have any merit, and we agree that the order should be enforced as far as the relief sought by the board, which is a bargaining order beginning on December, I believe it was, 6th of 2022. The union, however, is requesting that you sever and remand for reconsideration on the issue of the date that the bargaining obligation arose in this case. It seems to me somewhat unfair that you would want a date while the company had objections pending. And these are not frivolous. I mean, there are factual facts from which you could argue what they've argued throughout, whether or not any decider has actually agreed with them. But I honestly don't understand why the union is entitled to, I guess, a finding that there was an unlawful refusal to recognize and bargain with the union as of the date of the election when they had objections pending all the way through and they weren't ruled on until December 6, 2022. I mean, I really don't understand why you think you're entitled to a date earlier. So, Your Honor, if the employer presses objections that are ultimately unsuccessful, then the remedy that we're requesting is the ability for the union to retroactively bargain over that period of, in this case, almost seven months. I would argue that it's actually unfair to the employees and to the union to lose out on the ability to retroactively bargain as to that period. What does that mean, retroactive? So, does that mean, like, what does that mean in a practical sense? Does that mean that if there is an increase in wages, they would get the benefit of those increased wages during that period of time? Well, that could be the result, but basically, I mean, so, for example, if you were to enforce the order as the NLRB urges you to here, then that bargaining order is going to be retroactive as of December 2022, right? So, retroactive bargaining is already reality, and that just means that the employer is required to bargain as to subjects that were relevant as to that period, and that could look like a lot of different things. But I would say we would argue that it is not unfair because, again, there's already this retroactivity to bargaining. Yeah, but the retroactivity is to a date when your rights are clearly established because the board has overruled the objections that were made by the company. Yes, but the employer has the right, as they have here, to test the certification and to come to this court to, you know, to challenge that decision, right? And so, during that time, they're not bargaining with the union. So, I would argue that there's no difference in fairness. In either case, the employer may press challenges, but there will be—the result will be that they'll have to bargain over a different period. This isn't some kind of, you know—this isn't like a punishment. This is simply, you know, requiring bargaining that will cover the whole period since the employees— Somehow it seems like—I mean, you're not telling me specifically what the benefit is, but you wouldn't be making this argument if there wasn't some benefit to the union for making this argument. Yeah, well, the benefits are—I can name a few. So, one of the benefits is the right to a representative during an investigatory meeting. That's a right that only accrues to an employee that's represented by a union under the Weingarten decision. There's the right to request information. So, the union has a right to request information covering an earlier period and other rights like that. And so, again, this would allow the union to try to make up for that period of time in which they didn't represent the employee. It's not a punishment, and the parties have to reach an agreement. There's no agreement compelled under the Act. I'd also point to the statute under Section 9A speaks of a representative that is designated or selected by the employees. We believe that designation or selection happens on the day of the election. That's later found to be valid. We do not believe that the designation or selection occurs on the date that a regional director overrules a challenge. And Section 8A.5 of the Act that speaks to the bargaining obligation refers to Section 9 and refers to 9A. So, we believe this is the correct reading of the statute as well, and otherwise you're depriving employees of their- Has any circuit adopted this argument where there has been no bad faith during the interim period or no unilateral action by the employer? Because I don't see any of that. I don't see any bad faith here. They just were pursuing their objections, which they believe in. As Judge Wardlaw said, there seems to be a factual predicate for their objections. So, they're pursuing their objections through the process. Now, has any circuit in that situation said, oh, yeah, we got to apply- we go back to the date of the election? Not that I'm aware of, Your Honor. However, currently pending at this circuit is a CEMEX construction materials specific matter in which- and in the underlying board decision that's under your review right now. The board found in a footnote that they explained that under current law, the bargaining obligation begins as of the date of the election. And so, I think in that case is subject to your decision, changing some aspects of the selection procedure, but also goes into detail about Section 9 and about how all of this works. And we believe that that decision is consistent with what we are urging here. And that decision is recent. That's a 2023 case, I believe. Am I hearing you say that the board has internally inconsistent positions on this very issue? Yes, they do. Because under the CEMEX decision, there is a new doctrine that concerns, you know, when the union makes a demand for recognition. That's not in front of you here today. However, it sets up a way in which employees may more quickly have a representative represent them if they have majority and make a demand. And it also explains how the election process works. And in so doing, it explains that the date of the election, that the bargaining obligation begins as of the date of the election. So, you know, I haven't really looked at CEMEX. Is that what it's called? Yes, sir. But as I understand the board's law, is that where there's unilateral action during that period, then there might be a basis to go back to the date of the election. Or, as you attempted to argue in one of your briefs, if there's bad faith, that might be a basis. But your arguing about bad faith doesn't work because you didn't raise that before the board. So here, I mean, I think the board's law is that you can go back to the date of election if you can hook it on one of those factors. But, you know, I'd have to read CEMEX to see if it's in the same – along that same line, the board, you know, just adding another case to that line. No, Your Honor. I wouldn't characterize it that way. And I would just say that the – you're right, the employer may not make unilateral changes as of the date of the election. And we just think that in a case where the objections are then unsuccessful, that having a retroactive bargaining obligation – again, it's nothing punitive. It's simply to try to get the employees what they got when they validly selected that representative. What you're saying then is that the employer really doesn't have, you know, a right under the process to challenge the election results. I would disagree with that because, again, the employer has the right to challenge the certification. That's what they're doing here today. They have the right to do that. And they just – if they're unsuccessful, if they're – yeah, if they're unsuccessful, then they have certain obligations to their employees. But what if they're successful? And if they're successful, they have no obligation. They have no bargaining obligation anymore, and so they pay no price for having not met with the union. Okay. And I would just, again, urge that this court enforce the bargaining obligation. If you don't find you're able to sever this issue, then we'd rather the order be enforced as is than have the whole case remanded. Thank you. Thank you, counsel. Mr. Cantor. Mr. Cantor. May it please the court, Jared Cantor on behalf of the National Labor Relations Board. Your Honors, if a picture is worth 1,000 words, I would respectfully submit that the video in this case is worth all 9,700 words in our brief directed to the company's challenges. I think that video plus the documentary and video evidence makes very clear that UPS did not carry its heavy burden of showing that this alleged union misconduct made employee free choice impossible, which is the standard in this circuit. And therefore, it has presented no basis to overturn the board's decision to certify the union, which in this circuit is an abuse of discretion standard. Unless the court would like to jump to any specific objection, I would sort of like to take the points that seem to interest the panel from my brother at the bar's presentation. And the company tries to make this rule here that mere presence outside of this building essentially is objectionable, and whether it's because of the conversations or the standing around or the two instances where they greeted people by saying hey or hi. And that simply is not the law. As we discussed with regards to Objection 1, there's this Milcom rule. It's a strict prophylactic rule. I don't think there's any dispute here, really, that that is not at issue in this case because that would only apply to the immediate voting room, the break room, or any employees lined up inside the building waiting to go into that room. So as I understand the facts, at some point the board agent did come out and ask some union reps to move or something, but had never made it clear before the election began that the parking lot was off limits? That was a company representative, Your Honor. Okay. That was not the board agent. No concerns, which is one of the factors that the board looks at under the Boston Insulated Flexible Electioneering Standard. None of these complaints were raised to the board agent during voting. That was a company representative who came outside and asked them to leave. And essentially that is where the company then goes into this trespassing argument, that they were trespassing and they cite the plainly distinguishable Phillips Chrysler case, which is discussed in our brief. Did the union reps leave or move? Yes, Your Honor. There's no dispute. They immediately left and stood on the public sidewalk. So where the company is deriving their arguments on this point in the cases that were just cited are discussed in our brief where we, again, are addressing Objection 1 under the at or near the polls, no electioneering standard. And the company relies on cases that, again, we distinguish in our brief, but Pearson Education that they try to derive this presence rule from. In that case, we had an anti-union poster hung up by the employer in the area that had been curtained off for the election. So employees going to vote and while they were voting were in the presence of that. I really failed to see how that is this case. Allianceware is a very specific subset of board law having to do with sound trucks. And obviously, it's sort of understandable that maybe you do have a designated no electioneering case, but a union shouldn't be able to do an end run around that by just going a few feet beyond that and blasting a sound truck for five hours. Allianceware, again, we don't have a sound truck here. We don't have five hours of electioneering being broadcast. If I can interrupt you here, I have a more general question, and this may just betray my infamiliarity with labor law. But, I mean, are board opinions typically this short and terse? They're like three to four pages long. Like Milkem, Boston Insulated. Well, partly, Your Honor, those are older board decisions. Board decisions do tend to vary in length. And obviously, in these type of cases in particular, there's sort of a layer of board decisions because you have the initial hearing officer's decision. If there are exceptions to that, the regional director will weigh in and sometimes add or subtract from that analysis. If there's a request for review from the regional director's decision, the board will add on. So that's, if I will, if I may, that keeps me employed is sort of weaving together multiple documents presenting the agency's ultimate decision. But that is pretty common, especially in these cases that are called technical 885s. They are very short because the board's relying on all of the decisions from the underlying decision makers that it's adopting. And I guess that's, you know, my concern is these opinions, board opinions are so short, they barely have any analysis. And I think often they seem contradictory to each other and it's really hard to figure out how to reconcile some of these cases. I'm sure you could probably say the same thing to about Ninth Circuit opinions, but at least they're fairly long. There's a lot of analysis and, you know, lawyers who get paid good money can figure it out and point out and reconcile them. But here, like Milkem and Boston Insulated, I just don't, you know, I find it hard to differentiate between them because Milkem, which I assume is the seminal case, says no electioneering because you need peace and quiet. It's like a typical political election. You don't want people, you know, bothering you just as you're about to vote. And you look at elections here in California, there's a hundred feet rule before the election. Then you look at Boston Insulated, they kind of change it and say, well, there was a door, so that's good enough. I mean, I don't know how you reconcile it. Then it's just the board, just ad hoc, making distinctions. I don't know, maybe if it was a curtain, it would be a different rule instead of a door. Maybe I just, it's hard to make sense of all this. And this goes back to the question I asked your other counsel of does, I mean, I guess, it seems like it's unsettled and maybe it wasn't raised here, but, you know, whether Loper-Bright applies because it really, I had a hard time trying to reconcile all these cases, especially given how short they were. Well, Your Honor, certainly Loper-Bright was, is not litigated in this case. Speaking extemporaneously on that question, I think the board in this case is applying well-established jurisprudence. It's Boston Insulated analysis, the Milcom rule here. And so I don't think the board is engaged in any type of statutory interpretation that is the basis of the overruling of Chevron. And, but those two rules, they do serve sort of different purposes. Again, because Milcom is a strict rule that's not even really about electioneering. It prohibits any prolonged or sustained conversations with voters essentially in those final moments. And that's why it is such a strict prophylactic rule. As long as it's a prolonged or sustained conversation, doesn't matter what it's about, that would be a basis for then overturning an election. It's a very strict rule and it's, of course, then very limited. The voting room itself or employees in that final line going in. Boston Insulated, of course, then is broader than that. It's aimed at specifically then electioneering, not just any type of conversations. It has to be electioneering. And that is then applying multiple factors to look at whether alleged electioneering was sufficient to warrant an inference that there was an interference with employee free choice. And so that is not a strict prophylactic rule because you're going to look at the nature and extent of the alleged electioneering. So it has to be electioneering, not just conversations, whether it's by a party or by an employee, if it did occur in a no electioneering area or if it contravened any board agent instruction. And certainly the company has not challenged any of the board's sort of analyses in this case is in the sense of Boston Insulated is a bad test or is contrary to the act or anything like that. I do want to be respectful of the panel's times if there's no questions. I have one question. Does CEMEX, which I haven't looked at, was raised for the first time here today, does it hold that simple refusal to initiate collective bargaining pending board resolution of timely filed objections is a per se violation of Section 885? No, it does not, Your Honor. Okay, because my understanding is there's no board case that has ever held that. Well, that would show bad faith. Yes, Your Honor. The union here and again in our brief, we make a jurisdictional bar argument. The union here is trying to essentially ask the court to do away with the board's longstanding jurisprudence. That is typically called the Howard plating decision. And that is essentially what was talked about in the prior part of the argument, that post-election but pre-certification, so while an employer is exercising its rights to file an objection, as long as an employer essentially maintains the status quo, a simple refusal to bargain during that period is not a violation. They certainly might have an obligation, which is why the board's Mike O'Connor jurisprudence is you act at your peril during this period. But at least until the board issues that certification, which essentially finally puts you on notice that your challenges have no merit according to the board, during that period, it's sort of like a safe harbor. Maintain the status quo. They certainly are free to, of course, go bargain, but there's no violation at that point if they want to exercise their right to pursue their objections. Upon the issuance of the certification, then depending on if the union has asked for bargaining yet or does afterwards, that will then be the date of the violation. And then at that point, the union can then file an unfair labor practice charge with the board. And as the court may know, that will then lead to a board order that is reviewable in court. So then what's the context of CEMEX? So CEMEX is the board's new standard in a very specific area. CEMEX concerns remedial bargaining orders where an employer is first presented with a request from a union to voluntarily recognize it. And in that case, before an election is held, because the employer in that situation still has the right to say, well, I'd like to go to an election. The employer commits violations before there is an election. And the board in this new CEMEX decision has basically decided that in that situation, those unfair labor practices after the request for recognition, but before the election, taint the election. We will require you to bargain. We won't have a rerun election free from taint. And in that specific instance, the bargaining obligation will go back to the date when the union requested recognition. I see. It's a very different area. It is a very new standard. It is obviously currently being contested before this circuit. But CEMEX has nothing to do with the Howard plating. Simple refusal to bargain is not a violation. And that's this case. That is this case. This is a Howard plating type case. That the date of the violation will not come into effect until the certification is issued. And again, as we pointed out in our brief, the union before the board in its opposition to the company's motion for reconsideration essentially just said they tried to make this into a Mike O'Connor case. That the company had somehow had acted at its peril. And for that reason, the date should be moved up. And there simply is no evidence in this case that the company has done any of those things. It has acted consistent with Howard plating, refused to bargain until the certification, and therefore that's the date of the violation. Okay. All right. Thank you. If there are no further questions, the board requests that its order be enforced. And I thank the panel for being allowed to appear remotely. All right. Thank you very much. LRB versus UPS supply chain solutions will be submitted. This session of the court is adjourned for today. And we will be meeting with those in a high school. Perhaps our law clerks can keep them entertained for the next 15 minutes. It will probably start earlier than 1130. Okay. Thank you.
judges: WARDLAW, PAEZ, LEE